UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| WILLIAM SHIELL, IV and | * | CIVIL ACTION |
| JANET MARIE BROUSSARD SHIELL | * | |
| PLAINTIFFS | * | |
| | * | NO. |
| VERSUS | * | |
| | * | JUDGE |
| JOSEPH G. JONES, BRIAN BERNS, | * | |
| KRISTINA SKOLD CLARK, and | * | MAG. JUDGE |
| DAVID F. WAGUESPACK | * | |
| | * | |
| DEFENDANTS | * | |
| | * | |

\* \* \* \* \* \* \* \*

## **COMPLAINT**

NOW COME INTO COURT, through the undersigned counsel, William Shiell, IV and Janet Marie Broussard Shiell (hereinafter "plaintiffs" or "Mr. and Mrs. Shiell") who for their Complaint respectfully represent that:

1.

William Shiell, IV and Janet Marie Broussard Shiell are married to each other and are dual US/Canadian citizens legally domiciled, since 1997, at 922 Rue Cherrier, in the city of Montreal, province of Quebec, country of Canada. At the time of the events at issue in this Complaint Mr. and Mrs. Shiell had an additional residence located at 3705 Rue Chardonnay Drive, Metairie, Louisiana.

2.

The Whitney Bank is a bank now merged with Hancock Bank, located at 228 Saint Charles Ave. in the parish of Orleans in New Orleans, Louisiana. Among its officers, employees, or agents at relevant times for the purposes of this complaint were Joseph G. Jones, Brian Berns, and Christina Skold Clark. The foregoing officers, employees, or agents were employed by the

bank and head offices at the 228 Saint Charles Ave. location, which was the main branch of this bank.

3.

Made defendant herein is Brian Berns, upon information and belief, a person of the age of majority domiciled in the City of Covington, Parish of St. Tammany, State of Louisiana. At all times relevant to this Complaint Mr. Berns served as a loan officer for the bank.

4.

Made defendant herein is Joseph G. Jones, upon information and belief, a person of the age of majority domiciled in the City of New Orleans, Parish of Orleans, State of Louisiana. At all times relevant to this Complaint Mr. Jones served as a loan officer for the bank.

5.

Made defendant herein is Christina Skold Clark, upon information and belief, a person of the age of majority domiciled in the City of Kenner, Parish of Jefferson, State of Louisiana. At all times relevant to this Complaint Ms. Clark served as outside counsel and as a notary public for the bank.

6.

Made defendant herein is David Waguespack, upon information and belief, a person of the age of majority domiciled in the City of New Orleans, Parish of Orleans, State of Louisiana. Mr. Waguespack, at all times relevant to this Complaint, served as outside counsel to the bank, appearing on the record for the bank, in both the state court executory process proceedings and in the Bankruptcy proceedings of William Shiell, IV.

7.

Whitney National Bank offered a line of credit based upon receivables of up to $500,000 to Kitchen's International, Inc. in 2007. The line of credit was later increased to $540,000. When the line of credit was originated, Joseph G. Jones, as a loan officer for Whitney bank, required, as

a personal guarantee to the receivables financing, that William Shiell, IV and Janet Marie Broussard Shiell encumber the Chardonnay property, which at that time was free of mortgage, as additional collateral. The loan was agreed to be renewed on a yearly basis, with the additional collateral and guarantee, as long as the interest only payments were made on time. Also, some of the documentation generated over time by the bank indicated that the line of credit was for up to $1.5 million, but regardless of the reason for this, whether to provide room for further lending or simple error, the amount of credit actually extended and used was $540,000.

8.

Loan payments were made on time since the inception of the loan, with the exception of several occasions when the bank overlooked withdrawing the payments from Kitchen's Whitney operating account at the usual time and had to be alerted by Janet Shiell that the payment had not been taken as usual. However, in 2011 Kitchens suffered financial difficulties and incurred considerable legal fees and expenses due to the non-payment of commissions owed to it by various factories it represented, as well as for contracts Kitchens had performed in 2009 and 2010. The bank was advised of these problems and that litigation was in progress. Nonetheless, the Shiells continued to pay the loan on time.

9.

In November, 2010, William Shiell, IV was diagnosed with stage III (B): colon cancer. As he was not yet 65 and did not have Medicare, he had to return to Canada for surgery and additional necessary medical treatments. As he was completely incapacitated by the major surgery in May 2011, chemotherapy, and resulting neuropathy, he was no longer able to physically operate his business. William, although legally domiciled in Canada since 1997, was also required to return full-time to his Canadian domicile for treatment. Although the business suffered as a result of Mr. Shiell's illness, the Shiells still continued to make the monthly interest payments on time which the bank itself automatically deducted from Kitchens' Whitney

Operating account.

10.

The Hancock bank merged with Whitney. Unexpectedly, in 2012 at the annual July signing of the renewal of the loan, the Shiells were advised that the bank no longer wanted to accept only an unrecorded collateral mortgage but now wanted a recorded collateral mortgage on the Chardonnay property. Mr. Jones assured the Shiells that this would actually benefit them as it would give them more flexibility on their loan as the bank would be better secured and would not question future renewals of the loan if they had more than sufficient security based on the recorded mortgage in addition to the assets of the corporation.

11.

Although William Shiell, IV, who was the sole owner of the Rue Chardonnay property, was not obligated to sign this mortgage, as it had not been an original condition of the loan, he complied in good faith believing that the bank would be flexible in the event his health or the business did not improve. The Shiells were not advised that the bank would charge "costs" of over $3,000 in mortgage and attorneys' fees, nor did they agree to pay these fees or that these fees could be withdrawn from Kitchens' bank account at Whitney/Hancock. Had they been so advised they would have refused to agree to anything other than renewing the collateral mortgage that had existed since the 2007 signing. Nonetheless they were assured this mortgage would protect their home and could be converted at anytime by the Shiells to a traditional mortgage.

12.

On July 19, 2012, the Shiells met with Mr. Jones at Whitney Bank. They were presented with certain documents for signature. The documents presented to them did not include the promissory note dated September 10, 2012, the collateral mortgage and assignment of leases and rents dated July 19, 2012, or the collateral note dated July 19, 2012. It was not until later

bankruptcy proceedings, on or after October 23, 2015, the Shiells saw these documents for the first time and gained their first knowledge that Mr. Shiell's signature had been forged on those documents. Additionally, the collateral note and the collateral mortgage and assignment of leases and rents bear the signature of a notary public, who was not present at any point during the July 19, 2012 meeting to witness the execution of any document by Mr. or Mrs. Shiell. In fact, the Shiells have never met or even seen the notary who signed the forged document. Additionally, the collateral mortgage and assignment of leases and rents bears the signature of two witnesses who purportedly were in the meeting on July 19, 2012 to witness the execution of documents, but no such witnesses were actually present in the room at the time the Shiells signed any documents.

13.

Prior to the 2012 meeting, in 2011 at the annual execution of documents, Mr. Jones was initially informed of Mr. Shiell's diagnosis of advanced cancer, of his May 2011 cancer surgery and impending chemotherapy and other required medical treatment as it was understood at that time. Interestingly, Mr. Jones responded to the Shiells that he already knew of Mr. Shiell's illness, although he never made the source of his information clear.

14.

At the July 19, 2012, meeting, Mr. Shiell further advised and updated Mr. Jones as to the status of his illness and the ensuing problems with his chemotherapy. Mr. Shiell further explained that he had almost died and had been in intensive care on two occasions because of the strong chemotherapy he was undergoing and that he was further suffering an extremely painful neuropathy as a result of the surgery as well as a condition commonly referred to as "chemo brain", which causes problems with memory and reasoning ability. He also explained that his pain was being treated with strong narcotics and other powerful mind altering drugs which made it difficult for him to think and remember or to do something as simple as to walk in a straight

line or drive. He also explained that, as of that time, he was now under the care of a pain management doctor and currently being evaluated for additional surgery in an attempt to alleviate his unbearable pain.

15.

Despite the difficulties encountered by the Shiells and Kitchens International, the Shiells were not behind on the note when the 2012 note, if valid, would have expired in September 2013. (Ex. ___, bank statement showing deduction of payment.) The bank had even deducted a payment from Kitchens' account in the month of September 2013. In any event, only after this payment was taken did the bank call the entire note and give the Shiells only 30 days to pay the entire note balance, which they were not financially able to do at that time. The Shiells then asserted a prior promise by the bank to convert the line of credit to a regular consumer mortgage on the Rue Chardonnay property, which would have substantially reduced their interest rate and lowered their payments markedly, as they were paying a higher commercial rate of loan interest instead of a mortgage rate. In response, Whitney Bank, as the only alternative, offered a forbearance agreement dated November 1, 2013, which recited that Whitney Bank in fact possessed a Promissory Note dated September 10, 2012 by Kitchens in the original principal amount of $540,000. Specifically, the November 1, 2013 forbearance document lists among the "Loan Documents" a "Note." In turn, the term "Note" is defined thus:

> The term "Note" shall mean that certain Promissory Note dated September 10, 2012 by Kitchens in the original principal amount of $540,000.00" (Ex. ___, November 1, 2013 Forbearance Agreement at p. 3.)

This recitation, which was false, and was known to be false at the time it was made, was made for the express purpose of inducing the Shiells to execute the forbearance agreement. The forbearance agreement of November 1, 2013, included specific release language and reaffirmation language which would otherwise preclude the Shiells from asserting the invalidity of the loan documents, some of which were forged as noted above. While the Shiells do not

dispute executing the Forbearance Agreement dated November 1, 2013, it is their contention that the knowing presentation of this agreement by Mr. Berns and the fraudulent inducement by Whitney through Berns of the Shiell's to execute this agreement is but another act in furtherance of the racketeering conspiracy in this matter.

16.

Later the Shiells, again as the only alternative to full payment, were offered another forbearance agreement dated June 1, 2014. In form, the June 1, 2014, forbearance agreement is in "amendment to forbearance agreement" referring to the earlier November 1, 2013 forbearance agreement. This forbearance agreement actually bears the Shiells' Canadian legal address of 922 Rue Cherrier, Montreal, Quebec, Canada in the body of the document. (Ex. ___, June 1, 2014 forbearance agreement.)

17.

Again, the June 1, 2014, forbearance agreement contains language designed to preclude the Shiells from ever asserting claims against Whitney for the wrongdoing of Whitney's employees or agents. The language includes a reaffirmation of the language contained in the original forbearance agreement dated November 1, 2013, and a specific agreement to release and dismiss all claims presented in a federal court action "Janet Marie Broussard Shiell and William Shiell IV v. Whitney National Bank (merged with Hancock Bank) and Brian Berns, one of its loan officers and Joseph Jones, one of its loan officers, personally and corporately" bearing docket number 2:14cv980-SM-JCW on the docket of the United States District Court for the Eastern District of Louisiana.

18.

But for the mistaken and fraudulently induced belief that the Whitney/Hancock possessed a valid, legitimate, and properly executed Promissory Note free of forgery or other fraudulent entry of signature, the Shiells never would have executed the amendment to forbearance

agreement on or about May 30, 2014.

19.

But for the original false language in the forbearance agreement, which was repeated via inclusion of the reaffirmation language in the June 1, 2014, amendment to forbearance agreement, the Shiells never would have dismissed their prior federal court action and in the due course of litigation and discovery would have discovered the false and fraudulent signature on the September 10, 2012 Promissory Note. It must be noted again that up to this point in time the Shiells had yet to be provided with a copy of the September 10, 2012 Promissory note.

20.

In 2011 and prior years the Shiells were, as a matter of practice, given copies of all documents signed or executed during a meeting at the bank. This was not done in July of 2012.

**21.**

A second extension of the forbearance agreement was contracted via a "Second amendment to forbearance agreement" dated December 31, 2014, although it was actually signed in January of 2015. (Ex. ___, Second Forbearance Agreement.) This document was signed by Mr. and Mrs. Shiell, but only after it was prepared by the bank, emailed to Canada, signed in Canada by the Shiells, returned to the bank for signature by Berns in New Orleans, and then emails again to Canada. Again the form of that amendment to the original forbearance agreement recites that the Shiells are acknowledging and reaffirming the language of the original forbearance agreement, thereby incorporating the language which specifically misled the Shiells into believing that Whitney bank had a valid promissory note bearing theactual signature of Mr. Shiell which could be enforced against them.

22.

During the existence of the Second Forbearance Agreement the Shiells sought other financing so that they could pay off the bank and end an increasingly troubled financial

relationship. As part of this effort, the Shiells sought a conventional mortgage from Reliance Capital. Reliance Capital asked the Shiells for a note that was not expired and which reflected their current indebtedness to the bank. The Shiells requested the necessary documentation from the bank, but the bank never sent it to Reliance Capital. In May of 2015 Reliance Capital closed the Shiells' application file when they could not provide a current note after two months of requesting it and receiving no note document other than an expired note from a prior year. This led the Shiells to complain to the bank, asking why Berns would not cooperate. Berns refused to speak to the Shiells. Instead, on May 28, 2015, a threat of foreclosure was sent to the Shiells. Similarly, the Shiells tried to contact Waguespack, and all he would respond was that the Shiells needed to have their attorney contact him, although he knew that they had no attorney on this matter at that time as he had dealt directly with the Shiells concerning the forbearances and that the litigation up to that point between the Shiells and the bank had been handled pro se by Janet Shiell.

23.

On or about June 12, 2015, through defendant Waguespack, Whitney filed a petition for executory process in the 24th judicial District Court for the parish of Jefferson which was assigned docket number 750–576. Mr. Shiell was never served with this petition although David Waguespack had been advised on numerous times by Mrs. Shiell that they were residing in Montreal at 922 Rue Cherrier.

24.

The Shiells were unaware of the existence of this petition until late in August when they were sent by certified mail to 922 Cherrier Street in Montreal a copy of the petition, with no attachments, by an attorney, Rachel Silvers, who claimed to have been appointed as curator to "find them" as the Whitney Bank did not know their whereabouts. Mrs. Shiell disputed this but Ms. Silvers refused to discuss the process and said that she had done what was required of her

and was not required to represent the Shiells any further other than to warn them that they had to "do something" as they were about to lose their home.

25.

In an effort to save the property at issue, the Shiells contacted the judge who had heard the executory petition by Whitney. He was kind enough to meet with them and have a representative of the bank, David Waguespack, present. The judge and clerk of court were very sympathetic, but the judge explained that a curator had been appointed due to the Bank's claim that the Shiells whereabouts were unknown and that the curator had made an answer for them. The Shiells explained that the curator had not served them with the petition until months after the petition had been filed and after it had even been heard and, further, that the curator had filed as her only answer a simple blanket denial without details or supporting evidence, which the Shiells could have produced, and without even speaking to the Shiells at all. She had apparently not even requested a delay in order to speak with the Shiells before filing an answer which was legally of absolutely no value. The judge then very kindly advised the Shiells that there was absolutely nothing they could do now as this was an executory process that the bank had a right to per the documents provided by the Bank in their petition.

26.

At that time, the Shiells had no idea of what the judge was talking about as they had been sent no copies of the Bank's loan documentation presented in the executory petition by Silvers. But the judge just continued to gently explain to them that it was simply too late now for the Shiells to do anything except to try to save their home through a bankruptcy petition and ask for a stay on the sheriff's scheduled October 2015 sale of their property. During this entire meeting with the judge, Waguespack said nothing except to continue to falsely claim that the Bank had the right to do what it had done and had done absolutely nothing wrong. At this time, the clerk of court was looking at Waguespack as if she found him abhorent.

27.

The judge then terminated the meeting as his court was in session and he needed to continue with scheduled cases. The Shiells walked out of the courtroom and into an elevator with David Waguespack and asked him directly why a curator had been appointed when he knew their legal and residential address in Montreal and could have served them. He did not answer. They then advised him that they had received no loan documents from Silvers. Again there was no answer They then asked why they had not been provided with service of everything that had been presented to the court during the executory process and what exactly was an executory process. Waguespack simply refused to answer any of their questions and gave the Shiells the same response that he always gave them "to have your attorney contact me". He then walked out of the elevator and quickly away from them to avoid any further questions. This indeed was a strange response from an attorney who knew that the two lawsuits filed against the Bank, two of its officers and himself by the Shiells had, in fact, been filed Pro Se by the Shiells, showing they had no attorney representing them in this matter and that no attorney had taken part in the preparation and acceptance of the the forbearance agreements. As well, the fact that the Shiells had arrived at the court without legal counsel should have made the fact that they still had not retained an attorney to represent them quite clear to him.

28.

At this point in time, Waguespack, in an apparent attempt to persuade the Shiells to not examine the sequence of events or the substance of any documents too closely, wrote the Shiells by email that they had been treated well by the bank.

29.

The Shiells then followed the judge's advice and engaged a bankruptcy attorney in September 2015. After several meetings with this attorney, Mr. Shiell declared bankruptcy in a proceeding in the United States Bankruptcy Court for the Eastern District of Louisiana, "In re:

William Shiell, IV", bearing case Number 15-12556. This was a Chapter 13 bankruptcy application for William Shiell IV who feared this would damage his credit, as it did, but he simply had no choice given what the judge had explained to him and Silvers had warned him. The bankruptcy application was filed early in October and included a motion for a stay to stop the sheriff's sale of the Chardonnay property, which motion was granted and the stay placed stopping the sheriff's sale that had been scheduled for that very month.

30.

On October 23, 2015, defendant Waguespack, acting on behalf of and in conspiracy with the other defendants, filed a Motion for Relief from the Automatic Stay that had been granted and had stopped the scheduled October 2015 Sheriff's Sale of the Chardonnay property. This motion was filed in the William Shiell, IV bankruptcy proceeding via the Bankruptcy Court's electronic ECF filing system over the Internet. It bears docket number 10 in the bankruptcy proceeding, and attached to it is a series of exhibits which bear docket numbers 10–1, 10-2, 10-3, 10–4, 10-5, 10-6, and 10-7. Noteworthy among the documents attached as exhibit are the documents with forged signatures including the Promissory Note dated September 10, 2012, the Collateral Mortgage and Assignment of Leases and Rents dated July 19, 2012, and the Collateral Note dated July 19, 2012. Additionally among the referenced exhibits are the Forbearance Agreement and the two amendments to the Forbearance Agreement which were fraudulently obtained through the false recitation that Whitney/Hancock possessed a valid and legitimate Promissory Note. Finally, attached to The motion for relief from automatic stay as document 10-1 is an affidavit from Mr. Brian Berns, which falsely recites under oath that the promissory note dated September 10, 2012, the collateral mortgage and assignment of leases and rents dated July 19, 2012, and the collateral note dated July 19, 2012 were properly signed by Mr. and/or Mrs. Shiell as indicated on the documents. Mr. Berns in his affidavit further indicates that the forbearance agreements were in fact presented to the Shiells for execution as attached to the

motion for relief from automatic stay. At the time Mr. Berns executed the affidavit in question, due to the presence of the litigation caption on the affidavit and the ongoing litigation between the Shiells and Whitney at that time, knew that his affidavit would be filed into the record of the Bankruptcy Court for the Eastern District of Louisiana.

31.

Through the use of the forged documents, fraudulently obtained forbearance agreements, and the false affidavit of Mr. Berns, Whitney/Hancock was successful in obtaining relief from the bankruptcy stay such that it could pursue the executory process proceeding in the 24th Judicial District Court and reschedule the Sheriff's sale that had been stopped in October 2015. (Ex. ___, Insert date and docket number of relief from stay order.)

32.

In Whitney's motion papers to the United States Bankruptcy Court for the Eastern District of Louisiana it was claimed by Waguespack that the Shiells did not need the Chardonnay property because they had another house in Canada where they lived. Waguespack and particularly Berns knew this to be false as they knew that Mr. Shiells stayed in the Chardonnay property as needed, that he had medical treatments and surgery scheduled in the New Orleans area and in Canada in 2014 and 2015. Jones had been advised on several occasions that specialty procedures for Mr. Shiell were not all available in Canada and that he would have to return to the U.S. from time-to-time for those treatments. A detailed fact which had been made known to Jones was that the Chardonnay property was particularly useful because it had an elevator which kept Mr. Shiell from having to climb stairs, which was particularly painful given the neuropathy he was suffering in his legs. Another, view of the claims is that the bank knew where the Shiells were in Canada and any claim that they could not locate them to serve them was false.

33.

On more than one occasion Whitney/Hancock and/or Mr. Waguespack had been informed

how to locate the Shiells in Canada and transmit documents to them as needed. Indeed, Mr. Waguespack had sent to the Shiells, in Canada, letters about the sheriff's sale and a notice to vacate. As previously noted above in this complaint, the actual reason for the Shiells continued presence in Canada, to wit, medical treatment for Mr. Shiell's advanced cancer, was well known to Whitney/Hancock and its agents, employees, and attorney. In particular, defendant Waguespack knew that the Shiells were not in the New Orleans area, or the state of Louisiana, because he had transmitted the forbearance agreement to the Shiells via email in Canada for execution in Montreal. Brian Berns and Waguespack (who was furnished a copy of the Berns April 2014 letter by Berns) had also been notified in the letter of dated April 26, 2014 of William Shiell's continuing need for medical treatment in Canada and the Shiells residence in Canada in April 2014. As well, a lawsuit filed against the Bank, Jones and Berns dated April 30, 2014 also reflected that the Shiells' legal residence was 922 Cherrier Street in Montreal, Quebec, Canada. Despite this knowledge on or about July 1, 2015, Defendant Waguespack had sought an order from the 24th judicial District Court appointing a curator ad hoc without making any actual attempt to serve the Shiells at their legal residence in Canada via long arm service. This resulted in attorney Rachel I. Silver's being appointed as curator ad hoc. Curiously, when Ms. Silvers provied teh citation, notice of seizure and petition, as well as the curator's answer to the Shiells via certified mail, she did not provide the exhibits or attachments to the pleadings.

34.

The first time the Shiells saw the three forged documents at issue in this matter was when they were served with the Motion for Relief from Bankruptcy Stay filed on or about October 23, 2015, in the bankruptcy court for the Eastern District of Louisiana. As non-ECF filers they were provided these documents via mail, receiving them at some point in time in the week to ten days after their filing on October 23, 2015. After receiving the documents via mail, in due course the Shiells researched the mortgage and conveyance records in the 24th Judicial District Court and

learned that the forged documents had been filed into the public record there.

35.

The foregoing actions constitute a violation of the racketeering influenced corrupt organizations act 18 USC Section 1962 et seq, including the creation and operation of an enterprise in fact, acquisition of control of an enterprise, and/or conspiracy to violate the RICO statute and to commit racketeering violations and predicate acts. The specific predicate acts committed in violation of the federal racketeering statute include the following:

1. Wire fraud to Canada – Berns response letter to Janet Shiell's April 24, 2014 letter sent by E-mail dated May 1, 2014 referring the Shiells to contact only Waguespack.

2. Wire fraud to Canada – May 12, 2014 E-mail to Janet Shiell from Waguespack re: Berns letter and suggesting that a forbearance might be negotiated.

3. Wire fraud to Canada – particularly the transmission of the original forbearance agreement and two amendments to it.

4. Wire Fraud to Canada. Letter from Waguespack dated May 28, 2015 to Shiells fraudulently claiming that the bank holds a valid promissory note dated September 10, 2012 by borrower.

5. Wire fraud via filing electronically with the federal bankruptcy court – Motion for Relief From Automatic Stay,

6. Wire fraud via filing electronically with the federal bankruptcy court – Objection to Plan (Ex. ___, Bankruptcy Docket no. 26 and all exhibits, Doc. Nos. __ through ___)

7. Mail fraud to Canada – notice to vacate premises dated March 22, 2016 sent by Waguespack.

8. Mail fraud to Canada – letters concerning sheriff's sale

9. Mail and Wire fraud to Canada – Notification packet by Ms. Silvers sent by certified mail August 11, 2015 in her capacity at curator ad hoc and also later e-mailed to Janet Shiell in Canada at shielljanet@gmail.com.

36.

The foregoing actions constitute a violation of the Louisiana racketeering statute through the creation, Operation and conspiracy to operate a racketeering enterprise. Be specific predicate ask committed in violation of the Louisiana racketeering statute include the following:

1. Theft by fraud

2. Creation of false public records – original filings in mortgage records, not discovered until after documents produced in Bankruptcy and then researched/presence in records confirmed

3. Creation of false public records – filings in the executory process action – list each filing and or hearing at which a false record was used or a false transcript created through argument based on a false document

37.

As a result of the racketeering violations by the defendants in this action, the Shiells have been injured in their property through the ultimate seizure and sale of the three story property located at 3705 Rue Chardonnay, Metairie, Louisiana (which property contained an elevator essential to his ability to avoid stairs he could no longer climb which also extremely aggravated his neuropathy pain in his legs - pain increased greatly since he no longer has a home with an elevator in it.).

38.

This court has subject matter jurisdiction over this action pursuant to 18 USC section 1964, 28 U.S.C. §1367, and 28 U.S.C. §1332.

39.

Venue is proper in this judicial district pursuant to 18 USC § 1965 and 28 USC § 1391 because defendants are subject to personal jurisdiction in this judicial District Court and reside in this district. Additionally, many of the events which gave rise to liability in this action occurred

within this judicial district.

40.

As a result of racketeering actions in violation of federal and state law, the plaintiffs have suffered the following injuries and damages:

1. Loss of the Chardonnay property, its value, and its useful value to the Shiells.

2. Loss of the personal property which the Shiells were unable to remove from the Chardonnay property due to Mr. Shiell's illness and/or time limitations and expense.

3. The expense of moving and storing the personal moveable property the Shiells were able to remove from the Chardonnay property.

4. Travel and lodging expenses to stay in hotels and travel to and from Canada to Metairie for medical treatments and legal meetings after the bank illegally had the Shiells' property seized, sold, and the Shiells evicted.

5. The costs of the pro se lawsuits filed in attempts to stop the illegal proceedings based on forgeries.

6. Increased neuropathic pain for Mr. Shiell caused by stress and strain secondary to the loss of property.

7. Costs of the bankruptcy which had to be canceled when the bank refused the plan and was able to lift the stay through false allegations and costs to travel to and from Canada to meet with the bankruptcy attorney and attend meetings.

8. Loss of the fruit orchard, landscaping, and related expenses related to improvements to the Chardonnay property lost when the property was seized and sold.

9. Damage to credit caused by the seizure and sale of the property, with the resulting loss of credit in Canada.

10. Attorney's fees and court costs for prosecution of this action.

11. Any other damages that may be shown at the trial of the merits.

WHEREFORE, William Shiell, IV and Janet Marie Broussard Shiell, prays that, due proceedings be had and that there be judgment herein in favor of William Shiell, IV and Janet Marie Broussard Shiell and against the LIST ALL DEFENDANTS, defendant, for such sums as the Court should deem reasonable and proper, including general damages, statutory damages, punitive damages, and attorney's fees, together with legal interest thereon from date of judicial demand until paid, plus all costs of these proceedings as defined or provided for by the Federal Rules of Civil Procedure and the particular statutes under which this action has been filed, and for such other legal and equitable relief as the Court shall deem necessary and proper.

Respectfully Submitted,

DONALD L. HYATT, II (24808)
DONALD L. HYATT, II APLC
633 Village Lane North
Mandeville, LA 70471
Telephone: (504) 813-6727
Facsimile: (866) 377-8671
E-mail: hyattlaw@aol.com
***COUNSEL FOR THE PLAINTIFFS***

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| WILLIAM SHIELL, IV and <br> JANET MARIE BROUSSARD SHIELL <br> PLAINTIFFS <br><br> VERSUS <br><br> JOSEPH G. JONES, BRIAN BERNS, <br> KRISTINA SKOLD CLARK, and <br> DAVID F. WAGUESPACK <br><br> DEFENDANTS | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | CIVIL ACTION <br><br><br> NO. <br><br> JUDGE <br><br> MAG. JUDGE |

\* \* \* \* \* \* \* \*

## VERIFICATION DECLARATION

STATE OF LOUISIANA

PARISH OF ST. TAMMANY

Pursuant to the provisions of 28 U.S.C. §1746, I, William Shiell, IV, verify under penalty of perjury under the laws of the United States of America that I have personal knowledge of the following, and it is true and correct to my personal knowledge and belief

1. That he is the Plaintiff in the captioned case; that

2. That he has read the above and foregoing Complaint, and all of the exhibits thereto and; that the allegations and exhibits contained therein are true and correct.

This Declaration is based on my personal and direct knowledge and it is signed by me, William Shiell, IV , this 11th day of January, in the year 2019, in Covington, Louisiana.

_William Shiell IV_
WILLIAM SHIELL, IV

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| WILLIAM SHIELL, IV and<br>JANET MARIE BROUSSARD SHIELL<br>PLAINTIFFS | * * * | CIVIL ACTION |
| VERSUS | * * | NO. |
| JOSEPH G. JONES, BRIAN BERNS,<br>KRISTINA SKOLD CLARK, and<br>DAVID F. WAGUESPACK | * * * * | JUDGE<br><br>MAG. JUDGE |
| DEFENDANTS | * * | |

\* \* \* \* \* \* \* \*

## VERIFICATION DECLARATION

STATE OF LOUISIANA

PARISH OF ST. TAMMANY

Pursuant to the provisions of 28 U.S.C. §1746, I, Janet Marie Broussard Shiell, verify under penalty of perjury under the laws of the United States of America that I have personal knowledge of the following, and it is true and correct to my personal knowledge and belief

1. That she is the Plaintiff in the captioned case; that

2. That she has read the above and foregoing Complaint, and all of the exhibits thereto and; that the allegations and exhibits contained therein are true and correct.

This Verification Declaration is based on my personal and direct knowledge and it is signed by me, Janet Marie Broussard Shiell, this 11th day of January, in the year 2019, in Covington, Louisiana.

*Janet Marie Broussard Shiell*
JANET MARIE BROUSSARD SHIELL